UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 1, 2015
```

------------------------------------------------------------------X
                            :

ALEXANDRA GARCIA o/b/o S.H.S.,       :

                            :

                Plaintiff,    :        12-cv-5886 (KBF)

                            :

          -v-               :        OPINION & ORDER

                            :

CAROLYN COLVIN, Acting Commissioner of :
Social Security,                      :

                            :

                Defendant.   :

                            :

------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

    Plaintiff Alexandra Garcia ("plaintiff" or "Garcia") seeks review of the

decision by defendant Commissioner of Social Security (the "Commissioner") finding

that her daughter, S.H.S., was not disabled and not entitled to Supplemental

Security Income ("SSI") benefits under Title XVI of the Social Security Act (the

"Act").

    Plaintiff filed a claim for SSI disability benefits on behalf of her daughter

S.H.S. on July 9, 2008.  (Tr. 153-59.)[1]  The Commissioner denied plaintiff's

application on September 11, 2008.  (Tr. 104-08.)   A hearing before an

Administrative Law Judge ("ALJ") hearing was held on March 10 and June 16,

2010.  (Tr. 37, 78.)  Plaintiff and S.H.S. appeared pro se.  (Tr. 39-46, 78, 85.)  On

June 25, 2010, the ALJ issued decision finding that S.H.S. was not disabled under

the Act.  (Tr. 13-31.)

---

[1]      "Tr." references are to pages of the Administrative Record.

On July 26, 2010, plaintiff, then represented by counsel, requested review by the Appeals Council.[2]  (Tr. 10-12.)  On June 22, 2012, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final determination of the Commissioner.  (Tr. 1-3).  On August 1, 2012, plaintiff filed this action seeking judicial review of the ALJ's decision.  (ECF No. 1.)  Before the Court are cross-motions for judgment on the pleadings.

Upon review, and while noting the substantial analysis in parts of the ALJ's decision, this Court nonetheless believes remand is appropriate.  The decision failed to adequately address and analyze several important facts in the record.  For instance, it fails to directly address results from two standardized tests on which S.H.S. scored at or below two standard deviations of the mean.  Social Security regulations require such a substantial deviation to be specifically analyzed.  In addition, in determining that S.H.S. did not have a marked limitation in the domain of acquiring and using information, the ALJ relied on evidence of S.H.S.'s improvement but did not adequately address substantial contrary evidence covering a significant time period; he also relied on what the Social Security regulations consider an out-of-date IQ test.  Finally, in reaching his conclusion that S.H.S. did not have a marked limitation in the domain of relating and interacting with others, the ALJ improperly relied on evidence of S.H.S.'s good behavior but did not

---

[2]      On March 19, 2012, counsel for plaintiff submitted to the Appeals Council a statement in support of the request for review and additional evidence to be included in the administrative record. (Tr. 237-42.)  The Appeals Council accepted this additional evidence into the record.  (Tr. 4-5.)

adequately address other substantial evidence that support significant issues S.H.S. had relating to and interacting with others.

As discussed more fully below, plaintiff's motion is GRANTED and defendant's motion is DENIED.  This action is remanded to the Commissioner for further proceedings.

I.    FACTUAL BACKGROUND[3]

This Court reviews the ALJ's decision to determine whether he applied the correct legal standard and whether there is substantial evidence to support his determination that S.H.S. was not disabled between July 8, 2008, the date S.H.S. filed her application, and the date of the ALJ's decision, June 25, 2010.

A.    <u>Overview</u>

S.H.S., who was born in 1999, was nine years old when plaintiff applied for SSI disability benefits on her behalf.  (Tr. 302, 153-59.)  She is now sixteen.  Despite her ultimate diagnoses, S.H.S. exhibited early normal developmental milestones. (Tr. 311-12.)  She began exhibiting learning problems during first grade and repeated that grade.  (Tr. 187, 253, 312, 323, 425.)  S.H.S. was diagnosed with Obesity at age eight, and by age nine, she had been diagnosed with Attention-Deficit / Hyperactivity Disorder ("ADHD") and Learning Disability.  (Tr. 291, 311, 403.)  Near the end of second grade (2007-2008), S.H.S.'s mother requested an evaluation for special education placement; S.H.S. was subsequently classified as learning disabled and placed in special education classes.  (Tr. 253, 260.)  At ages

---

[3]     The Court recites here only those facts relevant to its review.  A further recitation of plaintiff's medical and academic history is contained in the Administrative Record.

nine and ten, she also received diagnoses of speech/language problems, Mixed Receptive-Expression Language Disorder, and Reading Disorder.  (Tr. 314, 370.)

    B.    <u>Treating Medical and Academic Evidence</u>

        1.    <u>2007</u>

In 2007, S.H.S. was diagnosed with Obesity and began participating in a weight management program at North Central Bronx Hospital.  (Tr. 292-301, 428)  Between October 2007 and June 2010, S.H.S.'s weight increased from 127 pounds to 220 pounds.  (Tr. 414, 428.)

        2.    <u>2008</u>

On March 14, 2008, S.H.S.'s second-grade teacher, Ms. Muller, reported that S.H.S. had a possible speech impediment and "ha[d] not mastered the spelling for many grade-equivalent words."  (Tr. 277.)  Muller also stated that S.H.S. was well-behaved, respectful, and followed rules and instructions.  (Tr. 278.)

On April 10, 2008, at a point when S.H.S. was in jeopardy of being held back again, school psychologist Mandy Wolkoff, Psy.D., conducted the first of what would be several psychoeducational evaluations.  (Tr. 253-58.)  The evaluation included the Wechsler Individual Achievement Test-II ("WIAT-II"), on which S.H.S. scored between 2 and 2.5 grade levels behind her same-age peers in reading and spelling, and 1 grade level behind her same-age peers in math.  (Tr. 255-57.)  Wolkoff also administered the Weschler Intelligence Scale for Children – Fourth Edition ("WISC-IV"), on which S.H.S. attained low average Full Scale IQ and Verbal Comprehension scores and a borderline score in Perceptual Reasoning.  (Tr. 254-55.)

In S.H.S.'s end-of-second-grade report, Muller evaluated S.H.S.'s reading as Level 1 ("far below grade-level standards") in reading, but a Level 2 ("approaching grade-level standards") in other subjects (Tr. 279-81).  In the same report, Muller noted that her view earlier in the year had been that although S.H.S. "has improved, her reading is still a great concern to me," but that by the end of the year, S.H.S. "has not made the progress in reading that I would have hoped for."  (Tr. 282.)

On May 7, 2008, the Board of Education ("BOE") completed an Individualized Education Plan ("IEP") for S.H.S.  (Tr. 260-70.)  She was classified as Learning Disabled and placed in a general education class, augmented by an 8:1, five-days-a-week resource room services, weekly small-group counseling, and testing accommodations (time-and-a-half and separate location testing).  (Tr. 260-70.)

On August 5, 2008, the DOE's speech pathologist, Arleen J. Suen, M.A., CCC-SLP, administered a standardized assessment of speech and language evaluation, which included the Test of Language Development - Intermediate: Fourth Edition ("TOLD-I-4").[4]  (Tr. 323-25.)  S.H.S. scored at or lower than two standard deviations below the mean in all but one area. (Tr. 324.)  Suen noted that S.H.S. displayed "significant difficulties in all areas of receptive and expressive language."  (Id.)

On August 11, 2008, S.H.S. was examined by Dr. Maite La Vega-Talbott at the Pediatric Neurology Clinic of St. Luke's-Roosevelt Hospital Center.   Dr. La Vega-Talbott noted a history of "problems with reading at school and very

---

[4]     Donald D. Hammill & Phyllis L. Newcomer, Examiner's Manual, Test of Language Development: Intermediate-Fourth Edition 22 (2008).

hyperactive with difficulty sleeping," "very active" behavior at home and "difficulty participating and concentrating" at school. (Tr. 289-91, 409-10.)  Dr. La Vega-Talbott noted that further examination is warranted to rule out ADHD, Learning Disability, and Fragile X Syndrome.  (Tr. 291.)  Three months later, Dr. La Vega-Talbott diagnosed S.H.S. with ADHD, Inattentive Type.  (Tr. 322, 391-400.)  Later, Dr. La Vega-Talbott added a second diagnosis of Learning Disability.  S.H.S. tested negative for Fragile X Syndrome.  (Tr. 403.)

In October 2008, S.H.S.'s second and third-grade special education teachers Muller and Ms. Jackson, completed NICHQ Vanderbilt Assessment Scale questionnaires, indicating that S.H.S. had issues with both hyperactivity and attention.  (Tr. 405-07.)

In November 2008, S.H.S. began taking Adderall XR at 10 mg daily to treat her ADHD; the prescription was increased to 20 mg daily the following month and remained at that strength through the following year.  (Tr. 322, 326, 377-80, 394-404.)[5]

### 3.    2009

S.H.S. continued to be monitored at St. Luke's for ADHD throughout 2009. (Tr. 377, 379, 393-99, 402.)  No side effects from her medication were noted and her prescriptions were renewed regularly.  (Tr. 393-99, 402.)  Her weight continued to increase.  (Tr. 393, 395, 397.)

In a February-March 2009 teacher progress report, Jackson, S.H.S.'s third-grade special education teacher, stated that S.H.S. continued to struggle to read,

---

[5]    S.H.S. switched to Concerta in 2010.  (Tr. 391.)

had "no decoding strategies," "skips word[s] entirely or mumbles through," and "relies heavily on pic[tures] to understand [the] story." (Tr. 244.)  Jackson reported that in math, S.H.S. is "stronger in calculation, but does not check answers," but has difficulty in math problems because she experiences "comprehension breakdown in word problems lead[ing] to inappropriate operations and thus incorrect answers." (Tr. 244.)

In March 2009, Jackson also completed a questionnaire for the Fisher Landau Center for Treatment of Learning Disabilities.  (Tr. 327-29.)  Jackson reported that S.H.S. was at below average, or at an unsatisfactory level, in reading, math, spelling and speech. (Tr. 327.)  S.H.S. read at an "end gr[ade] 1" level and did math at an "end gr[ade] 1 / beginning gr[ade] 2" level.  (Tr. 329.)  Although she was an "excellent listener, follows directions well, [and] does not need repetition," S.H.S. "often" or "always" failed to finish things she started, could not concentrate or pay attention for long periods, daydreamed, became lost in thought, was inattentive and easily distracted, failed to carry out assigned tasks, and needed much structure and supervision. (Tr. 328-29.)  Jackson further reported that S.H.S. could be cruel to other students, and sometimes provoked others, citing as an example enlisting classmates to "stop speaking" to each other.  Behaviorally, Jackson stated that S.H.S. often did not participate in group activities.  (Tr. 328-29.)

In March 2009, Wolkoff reexamined S.H.S. and performed a second psycho-educational evaluation.  (Tr. 421-25.)  Wolkoff again administered the WIAT-II, which yielded "minimal progress" in reading and spelling.  (Tr. 422, 24.)  S.H.S.

performed at a "mid first to low second grade level in the areas of reading and spelling" and "low third to low fourth grade level[] in math."  (Tr. 425.)

In S.H.S.'s April 8, 2009 IEP, she continued to be classified as Learning Disabled and was placed in a restrictive 12:1 special education class.  (Tr. 330-44.) She also received speech/language therapy twice weekly and counseling once a week.  Her testing accommodations remained in place, and the IEP also included modified promotion criteria.  (Tr. 330-44.)

     4.    <u>2010</u>

S.H.S. continued seeing a physician for her ADHD in 2010.  (Tr. 391-92.)  In March 2010, her ADHD medication was switched from Adderall to Concerta at 18mg daily.  (Tr. 391-401.)  In June 2010, the Concerta dosage was increased to 36 mg daily. (Tr. 414.)

S.H.S's January 27, 2010 IEP again placed her in the restrictive 12:1 special education class, and maintained the services of speech/language therapy, testing accommodations, and modified promotion criteria.  (Tr. 213-25.)  The IEP observed that S.H.S. made some improvements, but still had difficulty, for example, with decoding two- and three-syllable words, multiplication, and word problems.  (Tr. 215.)  The IEP listed an instructional level of second/third grade for decoding, reading comprehension, and listening comprehension; and a third-grade level in computation and problem solving.  (Tr. 215.) The IEP recommended against a general education placement because S.H.S. is "two years behind."  (Tr. 223.)

In a March 24, 2010 report, S.H.S.'s fourth-grade special education teacher, John A. Lewis, stated that S.H.S. had "serious" or "very serious" problems with

understanding school and content vocabulary, reading and comprehending written material, expressing ideas in written form, and applying problem-solving skills in class discussions. (Tr. 205-12.) In addition, Lewis reported that S.H.S. had "difficulty with peer to peer relationships" and "relating to others"; she was receiving counseling for these issues. (Tr. 208.) Lewis indicated that on known topics of conversation, S.H.S.'s speech was almost completely understandable, but on unknown topics of conversation was only half to two-thirds understandable. (Tr. 209.)

Lewis also reported that S.H.S. had difficulty in gym class and exhibited shortness of breath when climbing stairs. (Tr. 209.) Lewis noticed that S.H.S. sometimes did not change her clothes from the previous day, had body odor, and wore ill-fitting or inappropriate clothing. (Tr. 210.) She also frequently missed school due to illness. (Tr. 211.)

In S.H.S.'s fourth grade report card, Lewis stated that S.H.S.'s was a Level 1 and 2 ("Far below grade-level standards" and "approaching grade-level standards," respectively) in reading and writing. (Tr. 248-49.) In mathematics, S.H.S. performed "far below grade-level standards" throughout the school year. (Tr. 249.)

On March 29, 2010, consulting examiner Christina M. Laureano, M.A., CCC-SLP administered the Evaluation of Language Fundamentals – 4th Edition ("CELF-4"), a comprehensive, standardized assessment of language skills. (Tr. 366-71.) The test yields a core language score, comprised of four index scores: receptive language, expressive language, language memory and language content. Each

index score has a mean of 100 and a standard deviation of 15.  S.H.S. scored 64 in core language, 64 in receptive language, 67 in expressive language, 62 in language memory, and 54 in language content.  (Tr. 368.)  In sum, S.H.S.'s CELF-4 score was more than two standard deviations below the mean, and three of the subscores were also two standard deviations below the mean and one subscore was more than three standard deviations below the mean.

Based on the test results and informal assessments, Loreano determined that S.H.S. had severely delayed communication abilities and is "functioning [academically] approximately around the first-grade level."  (Tr. 369-70.)  Laurano added that S.H.S. had receptive language skills "approximately 3-5 years" behind. (Tr. 369.)  Her overall expressive language skills were over three standard deviations below expectations.  (Tr. 370.)  Laureano diagnosed S.H.S. with Mixed Receptive-Expressive Language Disorder and Reading Disorder.  (Tr. 370.)

C.    <u>Consultative Experts</u>

On August 18, 2008, consulting examiner Howard Tedoff, Ph.D. performed combined psychiatric and intelligence evaluations.  (Tr. 302-10.)  S.H.S. took the Wechsler Intelligence Scale for Children-Fourth Edition ("WISC-IV") for a second time, and attained Verbal, Performance and Full Scale IQ scores in the borderline range. (Tr. 308.)  Her Full Scale IQ score of 72 was in the 3rd percentile.  (Tr. 308.) Dr. Tedoff stated that S.H.S.'s borderline scores were consistent with her history as a slow learner with academic skills below grade level and requiring special education services.  (Tr. 305, 308, 309.)  Dr. Tedoff diagnosed S.H.S. with Learning

Disorder Not Otherwise Specified and Borderline Intellectual Functioning. (Tr. 305.)

Tomasito Virey, M.D., a consulting pediatrician, examined S.H.S. on August 26, 2008. (Tr. 311-15.) At the time of examination S.H.S. was 58 inches tall and weighed 155 pounds, placing her in the 97th percentile for weight. (Tr. 312.) Dr. Virey diagnosed S.H.S. with Obesity, Learning Disability, and a speech and language problem. (Tr. 314.)

D.     Non-examining Agency Medical Experts

On September 5, 2008, Dr. R. Mohanty, a State agency medical expert, reviewed the medical record and concluded that S.H.S. had severe impairments, but the impairments did not medically or functionally equal the listings. (Tr. 316-21.) Dr. Mohanty found that S.H.S. had no limitation in the domains of interacting and relating with others, moving about and manipulating objects, and self-care. He found that S.H.S. had less than marked limitations in the domains of health and physical well-being, acquiring and using information, and attending and completing tasks. (Tr. 318-19.)

On March 10, 2010, medical expert Dr. Robert Berk reviewed the record and testified at the administrative hearing that he agreed with Dr. Mohanty's conclusions based on medical and academic records through 2008. (Tr. 57-60, 65-67, 359-60.)

On June 16, 2010, Dr. Sreedevi T. Chandrasekhar testified at the administrative hearing that S.H.S. did not meet or equal any listed impairment. (Tr. 87, 97-100.) She opined that S.H.S. was markedly impaired in the domain of

11

health and physical well-being, and had problems in learning, but did not believe

they were serious.  (Tr. 97, 100.)

## II.     APPLICABLE LEGAL PRINCIPLES

### A.     Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party

may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same

standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R.

Civ. P. 12(c) motions for judgment on the pleadings."  Bank of N.Y. v. First

Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore,

"[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Id.

(quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

### B.     The Disability Standard

In order to establish disability under the Act, a plaintiff must establish that

he has "a medically determinable physical or mental impairment, which results in

marked and severe functional limitations, and which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

Under the Commissioner's regulations, if a child's impairment or combination

of impairments meets, medically equals, or functionally equals the requirements of

any impairment contained in the listing of impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("Appendix 1"), the child will be found disabled.  See 20

C.F.R. §§ 416.925, 416.926a(a).

     In determining whether a child's limitation is functionally equivalent to a

listed impairment, the ALJ evaluates the effect of the child's impairment in six

domains: (1) acquiring and using information, (2) attending and completing tasks,

(3) interacting and relating with others, (4) moving about and manipulating objects,

(5) caring for oneself, and (6) health and physical well-being.  20 C.F.R. § 416.

926a(b)(1)(i)-(vi). If a child has an extreme limitation in one domain of functioning

or a marked limitation in two domains of functioning, the ALJ will find that the

child's impairment is functionally equivalent in severity to a listed impairment. See

20 C.F.R. § 416.926a(a).

     A "marked" limitation occurs when an impairment "interferes seriously with

[the child's] ability to independently initiate, sustain, or complete activities."  20

C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation occurs when an impairment

"interferes very seriously with [the child's] ability to independently initiate, sustain,

or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  A child's day-to-day

functioning may be seriously or very seriously limited when the impairment(s)

limit(s) only one activity or when the interactive and cumulative effects of the

impairment(s) limit(s) several activities.  20 C.F.R. § 416.926a(e)(2)(i), (e)(3)(i).

    C.   Review of the ALJ's Judgment

     The ALJ applied the three-step framework required by 20 C.F.R. § 416.924(a)

to determine whether an individual under the age of 18 is disabled.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity.  (Tr. 19.)  At step two, the ALJ found that plaintiff had the following severe impairments:  ADHD, obesity, learning disorder, and speech and language delays.  (Tr. 19.)

At step three, the ALJ found that the medically determinable impairments failed to meet, or medically or functionally equal, any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.924(a), (b)-(d).  The ALJ concluded that S.H.S. did not have any extreme limitations in any domains of function.  He also concluded S.H.S. had a marked limitation in the domain of health and physical well-being, but that her limitations in the five remaining domains were "less than marked."  (Tr. 21-28.)

Because the Act requires marked limitations in two out of the six domains of functioning in order to impairments functionally equal a listed impairment, the ALJ found that S.H.S.'s impairments did not functionally equal a listed impairment. (Tr. 21-30.)

With regard to acquiring and using information, the SSA regulations require an assessment of whether the child is "able to use language to think about the world and to understand others and express [her]self; e.g., to follow directions, ask for information, or explain something."  20 C.F.R. § 416.926a(g)(1)(ii).[6]  With regard to

---

[6]     Children aged six to twelve like S.H.S. are expected to "be able to learn to read, write, and do math, and discuss history and science . . . [to] read[] about various subjects and produc[e] oral and written projects, solv[e] mathematical problems, tak[e] achievement tests, do[] group work, and enter[] into class discussions."  The children are also expected to "use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others."  20 C.F.R. § 416.926a(g)(2)(iv).

interacting and relating with others, the regulations require an assessment of "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others."[7]  20 C.F.R. § 416.926a(i).

Social Security regulations also provide additional guidance for ALJs to consider certain types of evidence.  For example, results from certain "comprehensive standardized test[s] designed to measure ability or functioning in that domain" must be considered.  20 C.F.R. § 416.926a(e)(1).  Children who "have a valid score that is two standard deviations or more below the mean, but less than three standard deviations" on such tests and whose "day-to-day functioning in domain-related activities is consistent with that score" will be found to have a "marked" limitation.[8]  20 C.F.R. § 416.926a(e)(2)(iii).  The regulations also require, "When we do not rely on test scores, we will explain our reasons for doing so in your case record or in our decision."  20 C.F.R. § 416.926a(e)(4)(iii)(B).  In addition, with respect to scores from IQ tests, the regulations require that their results, if

---

[7]     Children aged six to twelve like S.H.S. are expected to "talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand."  Examples of limited functioning in this domain include "difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself" and "difficulty speaking intelligibly or with adequate fluency."  20 C.F.R. § 416.926a(i).

[8]     Test scores that are "slightly higher" than two standard deviations below the mean can nevertheless yield a finding of "marked" or "extreme" limitation if "other information in your case record shows that your functioning in day-to-day activities is seriously or very seriously limited because of your impairment(s)."  20 C.F.R. § 416.926a(e)(4)(ii)(A).   Similarly, a sufficiently low test score may not yield a finding of "marked" limitation "if other information in your case record shows that your functioning in day-to-day activities is not seriously or very seriously limited by your impairment(s)."  Id.

"obtained between ages 7 and 16," be considered current for only "2 years when the IQ is 40 or above."  20 C.F.R. § Pt. 404, Subpt. P, App. 1

ALJs must also follow Social Security Rulings ("SSRs"), which are issued by the Commissioner and contain "precedential decisions" relating to claims for disability benefits.  SSRs "are binding on all components of the Social Security Administration. These rulings represent precedent final opinions and orders and statements of policy and interpretations" adopted by the SSA.  20 C.F.R. § 402.35. In this case, relevant SSRs include: SSR 09-3p., Title XVI: Determining Childhood Disability-the Functional Equivalence Domain of "Acquiring & Using Information," 74 Fed. Reg. 7511 (S.S.A. Feb. 17, 2009) and SSR 09-5p., Title XVI Determining Childhood Disability-the Functional Equivalence Domain of "Interacting & Relating with Others," 74 Fed. Reg. 7515 (Feb. 17, 2009).

An ALJ's decisions are subject to limited judicial review.  The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence.  When these two conditions are met, the ALJ's decision is final.  See Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If the Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive.  42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).  When the Appeals Council denies review after considering new evidence, the court reviews the entire administrative record— which includes the new evidence—and determines whether there is substantial evidence to support the decision.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").  The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists.  See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." (citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

III.   DISCUSSION

In this case, the ALJ found that S.H.S. has a marked limitation in only one of the six domains (health and physical well-being).  (Tr. 30.)  The ALJ found that while S.H.S. has limitations in four of the other five domains (acquiring and using information, attending and completing tasks, interacting and relating with others, and moving about and manipulating objects), they are "less than marked."  (Tr. 21, 24, 26, 28.)  Plaintiff's motion challenges the ALJ's determination that S.H.S. did not have marked limitations in the domains of acquiring and using information and interacting and relating with others.

The Court agrees that the ALJ's determinations as to both of these domains were flawed.  As an initial matter, the ALJ did not adequately consider two of S.H.S.'s standardized test results which directly contradicted his "less than marked" determination in those two domains.  The ALJ also improperly relied on evidence of improvement to the exclusion of substantial evidence showing the opposite; the decision should evaluate whether any improvement was persistent and extensive enough to render S.H.S.'s limitation in acquiring and using information less than marked.  Additionally, the ALJ improperly relied on an out-of-date intelligence test result.

In making his determination that S.H.S. did not have a marked limitation in relating and interacting with others, the ALJ failed to address significant record evidence strongly supporting a contrary finding.

18

A.    Standardized Testing Scores

S.H.S.'s standardized testing scores of more than two standard deviations below the mean strongly support that she had a marked limitation in the domains of acquiring and using information and in interacting and relating with others.  The ALJ did not adequately address this evidence.

Both the domains of acquiring and using information and interacting and relating to others involve assessments of the claimant's language skills.  20 C.F.R. § 416.926a(g), (i).  The Social Security regulations require that relevant standardized test scores that are two standard deviations or more below the mean support the finding of a "marked" limitation.  20 C.F.R. § 416.926a(e)(2)(iii).  In this case, S.H.S. had two sets of standardized test scores in language skills that are two standard deviations or more below the mean.

On March 29, 2010, S.H.S. took the CELF-4, a standardized assessment of receptive and expressive language skills.  (Tr. 366-71.)  The CELF-4 has a mean score of 100 and a standard deviation of 15.[9]  S.H.S.'s Core Language Score was 64, more than two standard deviations below the mean.  S.H.S.'s index scores were also more than two standard deviations below the mean:  64 for receptive language; 67 for expressive language, 62 for language memory, and 54 for language content.  Results from the CELF-4 are important for determining functioning in the domains of acquiring and using information and interacting and relating with others.  See Miles ex rel. J.M. v. Astrue, 775 F. Supp. 2d 715, 727-28 (S.D.N.Y. 2011) (holding that scoring two to three standard deviations below mean on the CELF-4 was

---

[9]    Eleanor Semel et al., CELF-4 Examiner's Manual 102-03 (2003).

evidence that claimant had "a marked limitation in the domain of interacting and relating with others" provided other record evidence was consistent); <u>F.M. v. Astrue</u>, No. 08-CV-4430 (CPS), 2009 WL 2242134, at *8 (E.D.N.Y. July 27, 2009) ("Given the vital importance of language abilities to the domain of acquiring and using information, the CELF–4 is properly considered a 'comprehensive standardized test designed to measure ability or functioning' in the domain."); <u>Martinez v. Astrue</u>, No. 07-CV-3156 (WHP)(GWG), 2008 WL 4178155, at *8 (S.D.N.Y. Sept. 8, 2008) ("Given the obvious potential relevance of the results of th[e CELF] speech test to an evaluation of the domain areas of 'acquiring and using information' and 'interacting and relating with others,' this test should have been addressed further at the hearing and in the ALJ's decision. In other words, an understanding of the relevance of this test appears to be 'crucial' to the evaluation of [plaintiff's] abilities.").

S.H.S. also had TOLD-I-4 language development test scores primarily at or below two standard deviations of the mean.  (Tr. 323-25.)  Her scores in organizing (60), grammar (68), semantics (59) and spoken language (60) were more than two standard deviations (15) below the mean (100).  Her score in listening was 70, exactly two standard deviations below the mean; her score in speaking was 71, a single point higher than two standard deviations below the mean.  (Tr. 324-25.)  The speech-language pathologist who examined S.H.S. stated that the child "displayed significant difficulties in all areas of receptive and expressive language. Deficit areas included reduced skills in listening, organizing, speaking, grammar,

and semantics.  [Her] level of functioning in these areas ranged from below average to very poor."  (Tr. 324.)

The ALJ's opinion did not adequately address S.H.S.'s CELF-4 or TOLD-I-4 scores.  Although the ALJ recognized that S.H.S.'s "expressive language skills were approximately over three standard deviations below" expectations according to a March 2010 speech and language evaluation (referring to the CELF-4 test), (Tr. 23), he nevertheless found that she had less marked restrictions in acquiring and using information without any discussion of his reasoning for discounting the above test results.  The ALJ's decision fails to mention that S.H.S.'s TOLD-I-4 test results were primarily over two standard deviations below the mean.  He states that "In August 2008, the claimant underwent a speech and language evaluation" and "she demonstrated significant receptive and expressive language delays . . . [which] affected her listening, organizing, and speaking skills for semantic and grammatical tasks."  (Tr. 22.)  He noted that the results showed S.H.S.'s "pragmatic and speech aspects were . . . adequate for daily conversation."  (Tr. 22.)

The SSA regulations require that when the ALJ chooses not to rely on test scores at or below two standard deviations of the mean, he must "explain [the] reasons for doing so."  20 C.F.R. § 416.926a(e)(4)(iii)(B).  In addition to the regulation's requirements, the ALJ must not ignore contradictory evidence.  See Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) ("[W]e cannot accept an unreasoned rejection of all the medical evidence in a claimant's favor.").  In determining that S.H.S. "had less marked restrictions than is supported by the

record" in the domain of acquiring and using information,[10] (Tr. 21-23), the ALJ's recitation of evidence supported impaired functioning.  He failed to discuss what, if any, evidence outweighed the importance of the test result.

On remand, the ALJ should more fully discuss these test results and assess those scores along with the record evidence of S.H.S.'s day-to-day functioning in these two domains.

B.   Reliance on Improvement in Acquiring and Using Information

In finding that S.H.S. had a less than marked limitation in the domain of acquiring and using information, the ALJ repeatedly remarked that she "made improvement," "continued to improve," "made progress," and had "improvement [] forthcoming."  (Tr. 21-22.)  However, evidence of improvement alone, without an assessment of how any such improvement reduced the claimant's functional limitations such that they are no longer, or never were, marked limitations, is insufficient.  See McClain v. Barnhart, 299 F. Supp. 2d 309, 325 (S.D.N.Y. 2004); Marizan ex rel. A.O. v. Colvin, No. 13-CV-3428 (VEC) (FM), 2014 WL 3905911, at *13 (S.D.N.Y. Aug. 11, 2014); McClain v. Apfel, No. 99-CV-3236 (VM) (JCF), 2001 WL 66403, at *11 (S.D.N.Y. Jan. 26, 2001) adopted as modified sub nom. McClain ex rel. McClain v. Halter, No. 99-CV-3236 (VM) (JCF), 2001 WL 619177 (S.D.N.Y. June 5, 2001).

---

[10]     In determining that S.H.S. had less than marked limitations in the domain of interacting and relating with others, the ALJ did not discuss the impact of S.H.S.'s test results on his determination at all.  (Tr. 26-27.)

Here, the ALJ does not address how improvements over time yielded a less than marked limitation in acquiring and using information.  In other words, there is no evidence that S.H.S.'s pace of progress as she grew older kept pace with the age-appropriate standards for functioning.  Although he states that the IEP from January 2010 stated that S.H.S. was now "at an instructional level of second/third grade for reading and writing and at the third grade for math," (Tr. 22, 215), the ALJ failed to explain:  1) whether any evidence of improvement was supported by other evidence in the record or 2) how these alleged improvements translated to a less than marked limitation level.  Improvement is, of course, relative.  One can show even significant relative improvement—but if the deficiency is sufficiently great, a marked limitation may remain.

For example, as noted above, S.H.S.'s test scores on the TOLD-I-4 in 2008 and the CELF-4 in 2010, administered two years apart, were both more than two standard deviations below average.  S.H.S.'s test results on the WIAT-II from 2008 to 2009 yielded no improvement (from 2008 to 2009, grade-level scores of 1.9 vs. 2.0 in word reading, 2.0 vs. 1.9 in reading comprehension, and 1.5 vs. 1.5 in pseudo-word decoding).  (Tr. 255-57, 423-24.)  In 2010, the consulting speech and language examiner Laureano determined that S.H.S. was still reading around a first-grade level, even though she was now in the fourth grade (after repeating first grade).  (Tr. 370.)  In addition, plaintiff continued to be placed in a 12:1 special education class and received speech/ language therapy, testing accommodations, and

promotion criteria during the disability period.  (Tr. 213, 224-25.)  In addition, the

2010 IEP that the ALJ cites stated that S.H.S. was "two years behind."  (Tr. 223.)

### C.   Weschler Intelligence Scale for Children

The ALJ relied on S.H.S.'s results from the WISC-IV from April 10, 2008.

The test result is out of date and reliance on it is not permitted by the SSA

regulations.  The ALJ noted,

> The claimant's academic performance was such that she was
> functioning within the low average range, again – not a marked
> classification.  According to the results from the WISC-IV, the claimant
> achieved a low average instruction level in verbal comprehension;
> borderline in perceptual reasoning; low average in working memory
> and average in processing speed.

(Tr. 22.)  Defendant concedes that the April 2008 IQ test the ALJ relied on was too

old to be considered as probative evidence under 20 C.F.R. § Pt. 404, Subpt. P, App.

1, which requires "IQ test results obtained between ages 7 and 16" be considered

current for only "2 years when the IQ is 40 or above."[11]  However, defendant is

incorrect in her position that S.H.S. was not prejudiced by the ALJ's reliance on this

test because a later test in August 2008 yielded the same score levels; the two

results were not identical.  The August 18, 2008 test yielded <u>borderline</u> scores in all

three composite scores, (Tr. 308), as opposed to <u>low average</u> scores in two composite

scores in April 2008, (Tr. 254.)[12]  The ALJ did not consider the August 2008 WISC-

IV result in his opinion; thus, on remand, the ALJ shall not use the "low average"

---

[11]     Because the April 2008 WISC-IV test was administered more than two years before the ALJ
considered it on June 25, 2010, it is out of date.  However, the August 18, 2008 WISC-IV test fell
within the two-year range.

[12]     Plaintiff also notes that the Full Score scale of 72, which is in the "borderline" range, fell
within the standard error range of the "deficient" range for the WISC-IV test.

results from S.H.S.'s 2008 WISC-IV to reach a conclusion that she did not have a

marked limitation in acquiring and using information.

> **D.**    Determination that S.H.S. is Well-Behaved

The ALJ also erred in relying on only certain evidence of S.H.S.'s behavior to

find that she did not have a marked limitation in interacting and relating with

others.  The ALJ relied on the fact that S.H.S. was "cooperative" and "respectful,"

and "[a]s such, less than marked restrictions in this domain is warranted" in his

discussion of S.H.S.'s limitations in this domain.  (Tr. 26-27.)  Although defendant

argues that the ALJ did not "solely" rely on the behavioral factors to reach his

conclusion, the "as such" language in the first paragraph of his opinion on this

domain suggests that his opinion was based on the recited instances of S.H.S.'s good

behavior.  In fact, throughout the opinion, he mentioned the terms "cooperative,"

"respectful," "friendly," "polite" or "well-behaved" / "excellent [behavior]" fifteen

times. (Tr. 26.)

A child's "lack of behavior problems is not dispositive of whether he has a

limitation" in the domain of interacting and relating with others.  Miles ex rel. J.M.

v. Astrue, 775 F. Supp. 2d 715, 729 (S.D.N.Y. 2011).  According to the

Commissioner's interpretation of the regulation on functional limitations, 20 C.F.R.

§ 416.926a,

> Children with impairment-related limitations in this domain may not
> be disruptive . . . Such children may be described as socially withdrawn
> or isolated, without friends, or preferring to be left alone. These
> children may simply not understand how to accomplish social
> acceptance and integration with other individuals or groups.  However,
> because children achieve much of their understanding about
> themselves and the world from their interactions, the impairment-

> related limitations of children who withdraw from social interaction
> may be as significant as those of children whose impairments cause
> them to be disruptive."

SSR 09-05, 74 Fed. Reg. at 7515-16.

On remand, the ALJ should consider the Commissioner's guidelines on the

domain, including the guidelines on age-appropriate speech and language and any

other considerations required by the regulations.  See SSR 09-05, 74 Fed. Reg. at

1516-17 ("The ability to interact and relate with others requires the ability to

communicate in an age-appropriate manner.  To communicate with others, a child

needs both speech and language . . . Within age-appropriate expectations, a child

must speak clearly enough to be understood, understand the message that another

person is communicating, and formulate sentences well enough to convey a

message.")

    E.    <u>Marked Limitation in Health and Well-Being</u>

On remand, the ALJ need not disturb its prior determination that S.H.S. had

a marked limitation in the domain of health and well-being from July 9, 2008 to

June 25, 2010.

This Court has power to limit the scope of remand to issues where it finds an

adequate reason to justify remand.  See 42 U.S.C. § 405(g) ("The court shall have

power to enter . . . a judgment affirming, <u>modifying</u>, or reversing the decision of the

Commissioner of Social Security, <u>with or without remanding</u> the cause for a

rehearing." (emphasis added)); <u>see also</u> <u>Miller v. Astrue</u>, No. 11-CV-4523 (DAB)

(MHD), 2012 WL 2899088, at *2 (S.D.N.Y. June 5, 2012) <u>report and</u>

<u>recommendation adopted</u>, No. 11-CV-4523 (DAB) (MHD), 2012 WL 2899097

(S.D.N.Y. July 16, 2012) ("[T]he court must determine, based on its assessment of the Commissioner's decision, that there is an adequate reason to justify a remand, and if so, the court will presumably identify in its decision what issues require remand.")  Although a plaintiff cannot escape full review of the ALJ's initial decision merely by suggesting that she has only sought to appeal from that portion of the decision that was unfavorable to her," Valverde v. Astrue, No. 08-CV-8084 (DAB) (DCF), 2010 WL 1506671, at *5 (S.D.N.Y. Mar. 23, 2010) report and recommendation adopted sub nom. Valverde v. Comm'r of Soc. Sec., No. 08-CV-8084 (DAB) (DCF), 2010 WL 1506673 (S.D.N.Y. Apr. 14, 2010), this Court has evaluated the ALJ's opinion and finds there is no adequate reason to justify remand on S.H.S.'s marked limitation in health and physical well-being.

In this case, the ALJ determined that based on substantial evidence, S.H.S.'s obesity led to restrictions in functioning that qualified as a marked limitation in the domain of health and well-being.  He adopted the testimony of non-examining medical expert Dr. Chandrasekhar and considered the results of pediatrician Dr. Virey's examination and other aspects of the administrative record.  (Tr. 30.) Defendant has not challenged the ALJ's determination for the period between plaintiff's application for disability, July 9, 2008, and the date of the ALJ's determination, June 25, 2010.[13]  There is thus no reason to revisit the determination that S.H.S. had a marked limitation in the domain of health and

---

[13]     Defendant's argument regarding collecting "new or different" information is unavailing, as any evidence pertaining to a later period is not relevant, and there is no indication that the administrative record is incomplete.

well-being during that period.  See Ocasio v. Astrue, No. 08-CV-2016 (JCF), 2009

WL 2905448, at *5 (S.D.N.Y. Sept. 4, 2009).

IV.    CONCLUSION

Accordingly, plaintiff's cross-motion to remand is GRANTED, defendant's

motion for judgment on the pleadings is DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 11 and

15, to terminate this action, and to remand this action to the Commissioner for

further proceedings consistent with this Opinion & Order.

SO ORDERED.

Dated:  New York, New York
December 1, 2015


_____
KATHERINE B. FORREST
United States District Judge